# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **CAROLINE COOPER,** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| **v.** | :      **No. 3:03cv2259(DJS)** |
| | : |
| **STATE OF CONNECTICUT PUBLIC** | : |
| **DEFENDER'S OFFICE,** | : |
| | : |
| **Defendant.** | : |

## MEMORANDUM OF DECISION

Plaintiff, Caroline Cooper ("Cooper"), brought this action alleging that defendant, the

State of Connecticut Public Defender's Office ("the Public Defender's Office"), discriminated

against her on the basis of her race, in violation of Title VII of the Civil Rights Act of 1964,

codified at 42 U.S.C. §§ 2000e et seq.  On December 2, 2005, pursuant to Rule 56(b) of the

Federal Rules of Civil Procedure ("Fed. R. Civ. P."), the Public Defender's Office moved for

summary judgment, arguing that Cooper has not produced sufficient evidence to establish a claim

of discriminatory failure to hire.[1]  For the reasons stated herein, defendant's motion for summary

---

[1]As a preliminary matter, the court observes that the Public Defender's Office also seeks
dismissal of the complaint, pursuant to Fed. R. Civ. P. 12(b)(5), for insufficient service of
process.  The defendant first raised this issue in its supplemental motion to dismiss.  (See dkt. #
19.)  On July, 29, 2005, the court denied this motion without prejudice.  (See dkt. # 30.)  The
court further ordered, "Plaintiff shall properly serve the State of Connecticut, Public Defender's
Office on or before July 29, 2005."  (Id.)  The defendant then renewed its 12(b)(5) argument in
its motion for summary judgment.  In her opposition papers, Cooper maintains that she
"promptly complied with the Court's Order." (Dkt. # 42.)  "Conclusory statements that a
defendant was properly served are insufficient to overcome a defendant's sworn affidavit that he
was never served with process."  Howard v. Klynveld Peat Marwick Goerdeler, 977 F. Supp.
654, 658 (S.D.N.Y.1997), aff'd, 173 F.3d 844 (2d Cir.1999).  When a defendant makes a Rule
12(b)(5) motion, it is the plaintiff's burden of proof to establish its service of process was
adequate.  See Preston v. New York, 223 F. Supp. 2d 452, 466 (S.D.N.Y. 2002).  Here, Cooper
has not adduced any proof to show that she complied with the court's order and that service of
process was proper.  However, since the outcome of Cooper's case would be the same, the court

judgment **(dkt. # 39)** is **GRANTED.**

## I. FACTS

Cooper is an African-American woman who had accumulated nearly twenty years of clerical experience when she enrolled in a paralegal program at the Connecticut Business Institute.[2]  As a part of her studies, in September, 1996, Cooper began a paralegal internship at the Public Defender's Office, located at 101 Lafayette Street in Hartford, Connecticut.  This internship was arranged through the Connecticut Business Institute.  The Connecticut Business Institute required Cooper to complete ninety hours of service at the Public Defender's Office.

John Barry ("Barry"), the Supervisory Assistant Public Defender at Geographical Area # 14 ("G.A. # 14") supervised Cooper when she interned for the Public Defender's Office.[3] (See dkt. # 39, Ex. B, Barry Dep. at 11:11-13.)  Cooper was also trained by Amparo Baena ("Baena"), Barry's secretary.  (See dkt. # 44, Ex. C, Baena Dep. at 10:19-20.)  The parties dispute whether Baena provided feedback to Barry regarding Cooper's performance.

As a paralegal intern, Cooper consistently earned excellent performance ratings from Barry.  During his deposition, Barry testified that he generally graded interns liberally.  (See dkt. # 39, Ex. B, Barry Dep. at 15:3-11.)  After Cooper had completed her ninety hours of service, Barry certified, to the Connecticut Business Institute, that Cooper had successfully finished her internship.

---

shall, in the interest of judicial fairness, reach the merits of Cooper's claims.

[2]The parties also refer to this school as "the Connecticut Business School."

[3]Barry supervised fifteen staff attorneys, as well as social workers, investigators, clerical staff, interns, and volunteers.

When Cooper's paralegal internship ended, she asked Barry if she could continue to work for the Public Defender's Office as a volunteer to gain more experience and possibly be considered for a job if one became available. (See id., Ex. A., Cooper Dep. at 21:3-6.) Barry granted her request, and Cooper continued to perform the duties that she had performed as a paralegal intern. Cooper's position as a volunteer differed from her position as an intern in two ways. She did not have a set schedule and Barry did not complete performance evaluations.

In September 1997, one of Cooper's sons was arrested and his case was assigned to G.A. # 14. Cooper approached Barry and asked him if she could speak to the judge presiding over her son's case. Barry told her that this would be inappropriate, and that she was not to approach the judge or the prosecutor assigned to her son's case. Sometime after this conversation, Cooper and Baena entered the Clerk's Office after the office had closed. They attempted to file a motion on behalf of Cooper's son. A clerk told the two women that they could not file the motion, and to come back during business hours when the Clerk's Office was open to the public. Baena and Cooper refused to leave the office and the two women were ultimately escorted out of the office by a sheriff. Cooper did not remove any files from the Clerk's Office, nor did she approach the judge assigned to her son's case. According to Barry's deposition testimony, as a result of this incident, he spoke to Cooper and instructed her that she was no longer allowed to enter the Clerk's Office. He also testified that, at the time of the incident, the Clerk's Office and the Pubic Defender's Office were connected by a doorway, and that because of Cooper's and Baena's actions, the Clerk of the Court was going to permanently seal-off the common doorway, but Barry prevailed upon the Clerk of the Court not to do so. The parties do not dispute that Barry spoke to Cooper about her behavior, that the doorway was not sealed-off, and that thereafter

3

Baena could only enter the Clerk's Office on official business during regular business hours.

In July 1997, Liz Cruz ("Cruz"), a Hispanic female, began an internship with the Public Defender's Office as part of a degree program at the Morse School of Business. Prior to her enrollment at the Morse School of Business, Cruz was employed as a cashier at a supermarket. (See dkt. # 39, Ex. 3.) Like Cooper, Cruz also served as a volunteer at the Public Defender's Office after she completed her internship.

In January 1998, the Public Defender's Office internally posted a job announcement for the position of "Public Defender Clerk, Geographical Area # 14." This was a clerical position. The posting read:

> [m]inimum qualifications include (2) years of clerical experience and an ability to type a minimum of 40 words per minute. Computer experience helpful. S.G. 12 ($13.45 per hour). This position is permanently scheduled for 20 hours per week, however, at least through June 4, 1998 it is authorized at 35 hours per week.

(See id., Ex. 2.) The Public Defender's Office did not advertise the job opening in newspapers. However, a memorandum dated November 27, 1995, which was issued by Eric Bengstrom ("Bengstrom"), the Personnel Director for the Division of Public Defender Services, and entitled "Hiring Practices and Procedures," reads, "[a]ll position vacancies will be advertised though my office. This will include newspaper advertising, notices to all offices, union notification, and in the case of attorneys, the Connecticut Law Journal." (Dkt. # 44 , Ex. I.)

Cooper submitted her resume[4], as did Cruz and another woman named Holly Texiera

---

[4]It is undisputed that Cooper possessed computer, typing, and word processing skills, including, experience with Microsoft Word, Lotus 1-2-3, DOS, TECHMAIL, and IBM Terminal.

("Texiera").[5]  The three internal candidates were the only candidates for the position.   Barry

testified that he could not remember whether he interviewed Cooper and Cruz.  According to

Barry, he might not have interviewed them because he would have been familiar with their work.

He did, however, interview Texiera.

Barry selected Cruz as his first choice for the position, followed by Texiera as his second

choice, and Cooper as his third choice.  Cruz and Texiera both spoke Spanish, whereas Cooper

did not.  In addition, both Cruz and Texiera were Hispanic, whereas Cooper was African-

American.  Barry testified that he selected Cruz because she was bilingual and because she "had

a better comprehension of the work in the office, of her role as the clerk, a deeper understanding

and better knowledge of the office and its procedures, and performed better."  (See dkt. # 39, Ex.

B, Barry Dep. at 34:13-16.)  During his deposition, Barry observed,

> Well, Ms. Cruz had one asset that was very valuable, her ability to speak Spanish.
> Because she was Hispanic, she was Puerto Rican and spoke Spanish, and many of
> our clients are Spanish or Puerto Rican, Hispanic.  It's a very valuable asset in a
> public defender's office, certainly in the City of Hartford with high Hispanic
> population.

(Id. at 33:8-14.)  He further testified,

> I thought that an additional Spanish speaking secretary would improve our ability
> to deal with our Hispanic clients because of vacation periods, illness on the part of
> other Spanish speaking staff, and also because our Spanish speaking staff in the
> past had tended to eventually leave the office and I was always in need of
> replacements who could speak Spanish.

(Id. at 38:7-13.)  Barry also indicated that he considered Cooper's and Cruz's attendance.

---

[5]Texiera had worked for Connecticut Public Defender Services as an Administrative
Clerk and Secretary from 1985 to 1990.  When she applied for the position of "Public Defender
Clerk, Geographical Area # 14,"  she was working as a temporary Administrative Clerk with the
Public Defender Services in New Haven.  (See dkt. # 39, Ex. 3.)

With respect to Cooper's attendance, Barry observed that he believed Cooper's "attendance as a volunteer was more sporadic," (see id. at 53:3-4), in that "she was not there for a lot of days each month," (see id., at 53:13-14), and that he "thought it was because either she had another job or was out looking for anther job," (see id., at 53:16-17). Lastly, Barry indicated that with respect to Texiera and Cruz, he selected Cruz because "distance was a factor" with Texiera. (Id. at 34:9.)

Cooper argues that Cruz was not qualified for the position because she did not have two years of clerical experience and because during her deposition, Cruz admitted that, as an intern and volunteer, she sometimes asked Barry questions if she did not know how to do something.[6] Both parties agree, however, that at the time, the Public Defender's Office had an unwritten policy whereby interns and volunteers could be interviewed for an open position even if they did not satisfy the minimum qualifications.

Barry informed Bengstrom of his view regarding the candidates. During his deposition, Barry testified that this was an "informal" recommendation, which would have been made verbally. Bengstrom concurred with Barry's recommendation. Indeed, Bengstrom made the same recommendation to Gerard Smyth ("Smyth"), the Chief Public Defender. Smyth then presented this recommendation to the Public Defender's Services Commission ("the Commission").[7] The Commission has the authority to appoint all staff

---

[6]Cooper admits that, on one occasion, she was unable to respond to a question posed to her by a client and that Barry had to assist her. Cooper, however, also offers Baena's deposition testimony that clients as well as perspective clients never complained about Cooper.

[7]The Commission is the supervisory body of the Public Defender Services. The Commission consists of seven members, including: two superior court judges (or one superior court judge and one retired judge); one member appointed by the speaker of the house; one

members working for the Public Defender Services.  (See dkt. # 39, Ex. B, Barry Dep. at

30:12-18.)  During its meeting of February 10, 1998, the Commission voted to waive the

newspaper advertising requirement for the position of "Public Defender Clerk,

Geographical Area 14 (Hartford)."  (See id., Ex. 4.)   Attorney Linda Kelly-Arnold voted

in opposition to the waiver.  (Id.)  Thereafter, the Commission voted unanimously to

appoint Cruz to the position of "Public Defender Clerk, Geographical Area 14

(Hartford)."  (Id.)

Barry informed Cooper that she had not been hired during their phone

conversation of February 11, 1998.[8]  Cooper testified that she was treated less favorably

after Cruz was appointed to the clerk position.  (See dkt. # 39, Ex. A, Cooper Dep. at

58:10-12.)  However, when Cooper was asked, "Did you have a hostile work

environment when you were volunteering at the Public Defender's Office?"  Cooper

responded, "No, I didn't."  (Id. at 51:2-5.)  She also provided the following deposition

testimony,

> Q:     [Y]ou never suffered racial discrimination while you were at work;
>          is that right?
>
> A:     Not while I was at work, no.
>
> Q:     Okay.  Did you ever feel racially harassed at work?
>
> A:     No.

---

member appointed by the president pro tempore of the senate; one member appointed by the
minority leader of the house; one member appointed by the minority leader of the senate; and a
chairperson appointed by the governor.  See Conn. Gen. Stat. § 51-289.

[8]It appears that Cooper initiated the phone call.

(Id. at 52:8-13.)  After approximately February 11, 1998, Cooper no longer volunteered at the Public Defender's Office.  Notwithstanding Cooper's testimony, she maintains that the Public Defender's Office discriminated against her on the basis of race when it hired Cruz, a Hispanic applicant with less than two years of clerical experience.

On or about May 4, 1998, Cooper filed a complaint with the Equal Employment Opportunities Commission ("EEOC"), alleging race discrimination by the Public Defender's Office.  Cooper also filed, on or about May 4, 1998, a complaint against the Public Defender's Office with the Connecticut Commission on Human Rights and Opportunities ("CHRO") alleging that she had been discriminated against because of her age.[9]  Then, during the month of June, 1998, Cooper's CHRO complaint was amended to include allegations of race discrimination.  The amended complaint alleged that she satisfied the minimum requirements of the job and was therefore qualified for the position.  Cooper further alleged that Cruz was less qualified, but was offered the job because she was younger and not an African-American.

On May 11, 1999, after an investigation, the CHRO dismissed Cooper's complaint on the merits.  It found that Barry had articulated legitimate, non-discriminatory reasons for not recommending Cooper for the position.  The investigator also concluded that Cruz's bilingual ability constituted a "bona fide occupational qualification," as defined by the Connecticut Fair Employment Practices Act ("CFEPA").

On May 24, 1999, Cooper filed an application for reconsideration.  Cooper's

---

[9]During the CHRO proceedings, Cooper alleged both race and age discrimination.  In the instant case, however, Cooper only alleges race discrimination.

request for reconsideration was granted on January 25, 2001.  Then, on June 27, 2001, after additional factfinding, the CHRO dismissed Cooper's complaint once again.  The investigator determined that there was no credible evidence that the defendant's decision not to hire Cooper was due to her age or race.  On July 11, 2001, Cooper filed another timely request for reconsideration with the CHRO.  This request was denied on December 11, 2002.  The CHRO concluded that there was no evidence that the Public Defender's Office discriminated against Cooper due to her race or age.

On or about September 30, 2003, the EEOC adopted the findings of the state fair employment practices agency and issued a "Notice of Suit Rights."  Plaintiff then commenced this action against the Public Defender's Office.  Cooper claims that she was not hired because of race discrimination and that the individual who was hired, Cruz, lacked the minimum qualifications for the position.  In support of this assertion, she offers Cruz's deposition testimony, whereby Cruz admitted that she did not have two years of clerical experience when she applied for the position,  (see dkt. # 44, Ex. D, Cruz Dep. at 16:25), as well as Baena's testimony that Cooper "was a person who could easily learn, perform a good job," (see id., Ex. C, Baena Dep. at 10:23-24).

Cooper also disputes Barry's assertion that, as she continued to volunteer with the Public Defender's Officer, her hours became more "sporadic."  For instance, she offers the CHRO Case Summary of May 4, 1998, (see id., Ex. L), in which the investigator chronicled the number of days and average length of day that Cooper worked for the Public Defender's Office from February, 1997 through January 1998.  It also compared Cooper's attendance with that of Cruz.  It reads:

|        | Compl[ainant] No. of Days [Worked] | Compl[ainant] Avg. Length of Day (Hours) | Cruz No. of Days [Worked] | Cruz Avg. Length of Day (Hours) |
|--------|------------------------------------|------------------------------------------|---------------------------|---------------------------------|
| 2/97   | 10                                 | 5.7                                      | NA                        | NA                              |
| 3/97   | 8                                  | 6.8                                      | NA                        | NA                              |
| 4/97   | 10                                 | 7.2                                      | NA                        | NA                              |
| 5/97   | 9                                  | 5.9                                      | NA                        | NA                              |
| 6/97   | 9                                  | 5.4                                      | NA                        | NA                              |
| 7/97   | 6                                  | 4.6                                      | 20                        | 4.1                             |
| 8/97   | 4                                  | 6.3                                      | 9                         | 4.1                             |
| 9/97   | 6                                  | 5.2                                      | 19                        | 4                               |
| 10/97  | 5                                  | 3.8                                      | 6                         | 3.1                             |
| 11/97  | 4                                  | 3.8                                      | 6                         | 3.1                             |
| 12/97  | 7                                  | 5.1                                      | 1                         | 3                               |
| 1/98   | 8                                  | 5                                        | 8                         | 4.4                             |

(Id.)  Thus, this report reveals that, between July 1997 and January 1998, Cooper worked

a daily average of 4.829 hours a day and Cruz worked a daily average of 3.686 hours a

day.

Lastly, Cooper contends that the Public Defender's Office deviated from its hiring

procedures and that these irregularities support her claim of race discrimination.

According to Cooper, there were three irregularities in the hiring process: (1) the Public

Defender's Office did not advertise the job opening in newspapers; (2) it waived the

minimum requirement of two years of clerical experience; and (3) it considered the

applicants' ability to speak Spanish.  In further support of her argument, Cooper claims

that in January 1998, the Public Defender's Office at G.A. # 14, which had a staff of

eighteen employees, already employed four non-attorney bilingual staff members and two

bilingual attorneys.[10]  She also offers the CHRO Case Summary of May 4, 1998, (see id.),

_____

[10]Cooper, however, admits that the CHRO investigator concluded that approximately fifty
percent of the Public Defender's Office's clients speak Spanish.  (See dkt. # 43.)

which found that the Public Defender's Office at G.A. # 14 had only hired one African-American of its last twelve hires.[11]  She further contends that, in January 1998, the Public Defender's Office at G.A. # 14 only employed three African-Americans:   Deputy Assistant Public Defender Linda Babcock; Assistant Public Defender Claude Chong; and Investigator I Harriet Howard.  Cooper admits, however, that Barry selected Marcia Alexander ("Alexander"), an African-American female, to be his Public Defender Secretary and that Alexander served as his secretary from approximately 1984 to 1992 or 1993.

## II.  DISCUSSION

Cooper claims that the Public Defender's Office discriminated against her on the basis of her race when it failed to hire her.  The Public Defender's Office argues that Cooper has not established a prima facie case of discriminatory failure to hire.  Alternatively, the Public Defender's Office argues that, assuming arguendo that Cooper has established a prima facie case, she cannot meet her ultimate burden of proving that it intentionally discriminated against her on an unlawful basis.  Because Cooper has not offered sufficient evidence upon which a jury could infer that race discrimination

---

[11]The court observes that Cooper admits that the case summary reads, "[t]here is no evidence in the file that the respondent discriminated against the complainant due to race and color or her age.  While the percentage of Black persons hired is relatively low over the previous years (i.e., one Black person hired in the last 12 persons hired), this in and [of] itself does not show that respondent discriminated against the complainant due to her color.  Further while complainant alleged that her age played a factor, evidence in the case file shows that the respondent hired a person in the complainant's age group and one significantly older (70 years).  While the evidence shows that there were some irregularities in the hiring process, there is no evidence in the file, which would show that the[se] irregularities were indicative of age or race discrimination." (See dkt. # 43; dkt. # 44, Ex. L.)

motivated the Public Defender's Office decision not to hire her, defendant's motion for summary judgment is granted.

## A. Summary Judgment Standard

A motion for summary judgment may be granted "if the pleadings depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catreet, 477 U.S. 317, 323 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" American Int'l Group, Inc., v. London Am. Int'l Corp., Ltd., 664 F. 2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the nonmoving party." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Id.

B.  Cooper's Discriminatory Failure to Hire Claim

Cooper alleges that the Public Defender's Office discriminated against her because of her race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.  Claims made under Title VII are analyzed under the burden-shifting framework as set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973).  Under that framework, the plaintiff has the initial burden to make out a prima facie case of discrimination.  Texas Dep't. of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  In order to make out her prima facie case, plaintiff must show that: (1) she is a member of a protected class; (2) she is qualified for the position; (3) she suffered an adverse employment action; and (4) that the circumstances surrounding the action give rise to an inference of discrimination.  McDonnell Douglas, 411 U.S. at 802.  Plaintiff's burden of establishing this prima facie case is minimal.  Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 91 (2d Cir. 2001).

If the plaintiff establishes a prima facie case, the employer has the burden of articulating a "legitimate, nondiscriminatory reason" for the adverse employment action.  Stern v. Trs. of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997).  If the employer does so, the plaintiff must prove by a preponderance of the evidence that the employer's proffered explanation is unworthy of credence, and that the true reason for the employer's action was discrimination.  See id.

Cooper has made a prima facie showing of discriminatory hiring.  As an African-American, Cooper meets the first prong because she is a member of a protected class.  Cooper has also adduced evidence showing that, at the time she applied for the position,

she had nearly twenty years of clerical experience and possessed computer, typing, and word processing skills. Thus, she satisfies the second prong because she has demonstrated that she possessed the minimum qualifications for the position. With respect to the third prong, Cooper has shown that she suffered an adverse employment action, i.e., she was not hired. Lastly, Cooper has offered evidence from which a reasonable factfinder could infer discrimination. Specifically, she has demonstrated that Cruz, a Hispanic female who did not have two years of clerical experience, was hired even though Cooper possessed the required two years of clerical experience. Accordingly, Cooper has also satisfied the fourth prong of the prima facie case.

Because Cooper has established a prima facie case, the Public Defender's Office has the burden of articulating a legitimate, nondiscriminatory reason for not hiring her. Here, the Public Defender's Office offers evidence showing that: Barry believed that Cooper's hours had become more "sporadic" hours as she continued to work as a volunteer; Cooper was reprimanded for going into the Clerk's Office after hours on a personal matter; and Barry had observed Cooper in a situation where she failed to adequately assist a client. The Public Defender's Office also argues that there was a growing need for bilingual employees and thus Barry's decision to select Cruz because of her ability to speak Spanish was a legitimate, nondiscriminatory reason to hire Cruz. As the Public Defender's Office bears merely a burden of production, not of persuasion, this offer of proof is sufficient to meet the defendant's burden at this stage of the analysis. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000).

Since the Public Defender's Office has articulated legitimate, nondiscriminatory

reasons for not hiring Cooper, the burden shifts back to Cooper to produce evidence that

the defendant's proffered legitimate nondiscriminatory reasons are pretextual, thus

supporting the inference that the real reason for the adverse employment action was

discriminatory.  Cooper may meet this burden "either directly by persuading the court that

a discriminatory reason more likely motivated the employer or indirectly by showing that

the employer's proffered explanation is unworthy of credence."  Burdine, 450 U.S. at

256.  The Supreme Court has observed, however, that "[c]ertainly there will be instances

where, although the plaintiff has established a prima facie case and set forth sufficient

evidence to reject the defendant's explanation, no rational factfinder could conclude that

the action was discriminatory."  Reeves, 530 U.S. at 148.  This is such a case.

     Although Cooper may be able to show that there is a factual dispute as to whether

her hours became more sporadic, Cooper has not submitted sufficient evidence from

which a jury could infer that the defendant's action was discriminatory.  See id. (finding

that, an employer may be entitled to judgment as a matter of law if  "the record

conclusively revealed some other, nondiscriminatory reason for the employer's decision"

or "if the plaintiff created only a weak issue of fact as to whether the employer's reason

was untrue and there was abundant and uncontroverted independent evidence that no

discrimination had occurred.").  In support of her contention that her hours did not

become sporadic, Cooper argues that, as a volunteer, she did not have a set schedule.  She

also offers the CHRO Case Summary of May 4, 1998, which reveals that between

February 1997 and January 1998, she worked an average day of at least five hours during

the following months: February 1997, March 1997, April 1997; May 1997, June 1997;

August 1997, September 1997, December 1997, and January 1998. Even though Cooper may be able to prove that her hours had not become "sporadic," she cannot satisfy her ultimate burden because the record conclusively reveals that there are other, nondiscriminatory reasons for the Public Defender's Office's decision not to hire her.

The Public Defender's Office has offered substantial evidence that it did not hire Cooper because of her performance as a volunteer. First, the Public Defender's Office has offered evidence showing that Cooper entered the Clerk's Office after hours to pursue a personal matter and had to be escorted out of the office. In addition, Barry testified that Cooper was subsequently barred from the Clerk's Office, and that as a result of her actions, the Clerk of the Court was going to seal-off the common doorway connecting the Public Defender's Office and the Clerk's Office. Barry, however, prevailed upon the Clerk of the Court not to do so. The court finds it significant that Cooper does not dispute that these events occurred. Cooper argues that this incident only harmed herself and Baena. The court finds Cooper's argument not credible. According to Cooper, the incident did not harm the Public Defender's Office. This argument fails, however, because Cooper does not dispute that her actions precipitated discussions between Barry and the Clerk of the Court regarding the Clerk of the Court's desire to seal-off the common doorway due to Cooper's and Baena's actions. In addition, the court finds that Barry properly relied upon this incident because it speaks to Cooper's judgment as an employee as well as her ability to follow instructions.

Second, the Public Defender's Office has offered Barry's deposition testimony, whereby he testified that he observed an incident when Cooper had difficulty responding

to a client's inquiries.  Here again, Cooper concedes that she once was unable to respond to a question posed by a client and that ultimately, Barry had to step in and assist the client.  In addition, Cooper has offered no evidence to contradict Barry's observation that Cruz "had a better comprehension of the work in the office, of her role as the clerk, a deeper understanding and better knowledge of the office and its procedures, and performed better."  (See dkt. # 39, Ex. B, Barry Dep. at 34:13-16.)  That Cooper disagrees with Barry's characterization of her performance is not enough to show an unlawful animus.  See Walters v. Columbia Presbyterian Hosp., No. 89 Civ. 1326(MBM), 1990 WL 43932, at *5 (S.D.N.Y. Apr. 9, 1990) ("[A]n employer is allowed to misjudge the worth of its employees, so long as its evaluation is not based upon a discriminatory purpose." ) (citing Burdine, 450 U.S. at 258-59.)  Here, Cooper cannot show a discriminatory purpose.  Notwithstanding Cooper's claim that the Public Defender's Office engaged in race discrimination when it failed to hire her, Cooper provided, in her own deposition, testimony that she did not suffer racial discrimination when she worked at the Public Defender's Office.  (See dkt. # 39, Ex. A, Cooper Dep. at 52:8-13.)  Indeed, she admitted that she never felt racially harassed and that she never endured a hostile work environment.  (See id. at 52:8-13; id. at 51:2-5.)  This testimony strongly suggests that discriminatory animus did not play a role in the defendant's decision not to hire Cooper as a clerk.

Cooper's attempt to show discriminatory animus by arguing that the Public Defender's Office deviated from its hiring practices is also without merit.  "Departures from procedural regularity . . . can raise a question as to the good faith of the process

where the departure may reasonably affect the decision." <u>Stern</u>, 131 F.3d at 313 (citing

<u>Zahorik v. Cornell Univ.</u>, 729 F.2d 85, 93 (2d Cir. 1985)).  Here, Cooper has not shown

how the Public Defender's Office's actions affected the hiring decision.  Indeed, the

record reveals that the internal posting enabled Cooper to both apply for and be

considered for the clerk position.  With respect to Barry's decision to recommend Cruz,

Cooper herself admits that at the time Cruz was appointed, the Public Defender's Office

had an unwritten policy whereby interns and volunteers could be interviewed for an open

position even if they did not satisfy the minimum qualification of two years of clerical

experience.  (<u>See</u> dkt. # 43.)  Furthermore, Cooper does not dispute that Barry, who

supervised both Cruz and Cooper, was in a position to evaluate both Cruz's and Cooper's

work performance and clerical skills.  Nor does Cooper dispute that the Commission

voted to waive the minimum requirement of two years of clerical experience.  Although

one member of the Commission voted against the motion to waive the requirement of two

years of clerical experience, Cooper has not shown that the Commission's vote was

guided, in whole or in part, by a discriminatory purpose.

Lastly, Cooper attempts to show that the Public Defender's Officer improperly

considered the applicants' ability to speak Spanish.  Although Barry may have ranked the

applicants, in part, upon their ability to speak another language, Cooper has offered no

evidence showing that the candidates were evaluated on the basis of their surnames,

ethnicity, or race.  <u>See</u> <u>Beck v. State of Illinois Dep't of Children and Family Services</u>,

No. 94 C 5617, 1997 WL 282995, at *4 (N.D. ILL. May 16, 1997) (denying summary

judgment where it was unclear as to what extent ethnicity played in "guiding" defendant's

hiring decisions). Furthermore, language requirements have been found to serve

legitimate, non-discriminatory purposes in similar circumstances. See, e.g., Prado v. L.

Luria & Son, Inc., 975 F. Supp. 1349, 1353 n. 3 (S.D. Fla. 1997) (noting that in customer

service positions, "[b]ilingualism as a criteria for employment may survive a challenge

for discrimination as furthering a legitimate employer interest-accommodating customers

who cannot speak English"). In the case presently before the court, Cooper, who does not

speak Spanish, concedes that the Public Defender's Office serviced Spanish-speaking

clients. Cooper's argument that the Public Defender's Office, which had a staff of

eighteen employees, did not have a need for another Spanish-speaking staff member fails.

According to Cooper, in January 1998, G.A. # 14 already had four non-attorney bilingual

staff members and two bilingual attorneys. Cooper, however, does not offer any evidence

contradicting Barry's deposition testimony in which he observed, "an additional Spanish

speaking [employee] would improve our ability to deal with our Hispanic clients because

of vacation periods, illness on the part of other Spanish speaking staff, and also because

our Spanish speaking staff in the past had tended to eventually leave the office. . . ."

(Dkt. # 39, Barry Dep. at 38:7-13.) Nor does she dispute Barry's deposition testimony

that he also based his hiring decision upon his observation of Cooper's work performance

as a volunteer. Thus, Barry's deposition testimony reveals that the applicants' ability to

speak Spanish, and not their race or ethnicity, was one factor he considered while

deciding who to hire. Barry further indicated that he considered this factor because the

Public Defender's Office services a significant number of Spanish-speaking clients and

has a specific need to properly represent its clients.[12]

Although Cooper offers the CHRO Case Summary of May 4, 1998, which found that only "one Black person was hired in the last 12 persons hired," (dkt. # 44, Ex. L), Cooper offers no evidence showing that Barry or the Commission deviated from the standard procedures with the aim of hiring someone of a particular race or ethnicity. While Cooper speculates that discriminatory animus fueled these actions, "such conclusory allegations . . . are insufficient" to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985); see Singleton v. Fed. Bureau of Prisons, No. CV-04-1526(CPS), 2006 WL 1329712, at * 9 (E.D.N.Y. May 16, 2006) (stating that even assuming that the Bureau of Prisons did not follow its procedures, this, in and of itself, is insufficient to demonstrate that the Bureau of Prisons acted with a discriminatory purpose). Indeed, besides Cooper's membership in the protected class and the fact that somebody outside of the protected class with less clerical experience was hired, Cooper has offered no evidence that she was not hired because of her race. Cf. Schnabel v. Abramson, 232 F.3d 83, 88 (2d. Cir. 2000) ("In fact, beyond the minimal proof required to state a prima facie case, [plaintiff] has offered no evidence that he was discriminated against because of his age."). Significantly, Cooper admits that even though Barry did not recommend her for the clerical position, Barry was the decision-maker who permitted her to intern with the Public Defender's Office in the first place, and it was he who then allowed her to continue to work for the office as a volunteer. Cf.,

---

[12]Moreover, the court observes that Cooper admits that the CHRO investigator found that approximately fifty percent of the Public Defender's Office's clients speak Spanish. (See dkt. # 43.)

Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir.1997) ("Although each case must involve an examination of all the circumstances, some factors strongly suggest that invidious discrimination was unlikely. For example, when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire."). Here, it would be difficult to impute an invidious motivation to Barry,[13] because although he did not recommend Cooper to the Commission, he permitted Cooper to work at the Public Defender's Office in the capacity of a paralegal intern and then decided to allow Cooper to work at the office as a volunteer.

An examination of the entire record reveals that there simply is insufficient evidence upon which a reasonable jury could conclude that race discrimination motivated the Public Defender's Office decision not to hire Cooper. See Schnabel, 232 F.3d at 90 (quoting Reeves, 530 U.S. at 143) (to survive summary judgment, the Court must examine "the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'"). Cooper has not credibly called into question the nondiscriminatory explanations offered by the Public Defender's Office and summary judgment, therefore, is warranted.

---

[13] Additionally, the court observes that Cooper admits that Barry selected Marcia Alexander, an African-American female, to be his Public Defender Secretary and that Alexander served as his secretary from approximately 1984 to 1992 or 1993. (See dkt. # 43.)

### III.  CONCLUSION

For the forgoing reasons, defendant's motion for summary judgment **(dkt. # 39)** is **GRANTED**.

**SO ORDERED** at Hartford, Connecticut, this __29th___ day of March, 2007.

**/s/DJS**
_____
**DOMINIC J. SQUATRITO**
**UNITED STATES DISTRICT JUDGE**